**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TOURMALINE PARTNERS, LLC, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | 3:13-cv-00108 (VAB) |
| v. | : | |
| | : | |
| NICOLA MONACO, | : | FEBRUARY 16, 2016 |
| | : | |
| Defendant. | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

This action arises out of a dispute between an investment firm and its former employee.

Plaintiff, Tourmaline Partners, LLC ("Tourmaline"), asserts six claims against Defendant, Nicola

Monaco ("Monaco"): (1) violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen.

Stat. §§ 35-50, *et seq.* ("CUTSA"); (2) violation of the Connecticut Unfair Trade Practices Act,

Conn. Gen. Stat. §§ 42-110a, *et seq.* ("CUTPA"); (3) breach of common law fiduciary duty and

duty of loyalty; (4) breach of contract; (5) replevin; and (6) conversion.  Monaco moves under

Federal Rule of Civil Procedure 56 for summary judgment as to all counts.  For the following

reasons, the motion is DENIED.

## II.   UNDISPUTED FACTS

Tourmaline is a Connecticut limited liability company with a principal place of business

in Stamford, Connecticut.  L.R. 56(a) Stmts. ¶ 1.  On January 18, 2011, Tourmaline hired

Monaco as an at-will employee.  *Id.* ¶¶ 3, 10.  Tourmaline hired Monaco because it wanted to

expand its operations into the Canadian Stock Exchange, and Monaco was a Canadian citizen

who had Canadian clients, some of which he brought to Tourmaline.  *Id.* ¶¶ 6, 11, 12.  Monaco

became Tourmaline's Director of Canadian Trading and Business Development.  *Id.* ¶ 14. Tourmaline secured an H1-B visa for Monaco at its expense.  *Id.* ¶¶ 8-9.

On January 15, 2011, Tourmaline and Monaco entered into a Restrictive Covenant Agreement (the "First Agreement").  *Id.* ¶ 16.  On July 11, 2011, Tourmaline and Monaco entered into an Employee Secrecy, Non-competition and Non-solicitation Agreement (the "Second Agreement").  *Id.* ¶ 19.

In July 2012, Tourmaline allowed Monaco to relocate to California and work out of a home office there.  *Id.* ¶¶ 4, 23.  Tourmaline purchased telephone and computer equipment for Monaco's home office.  *See id.* ¶ 22, 26.  Monaco purchased a cell phone and Tourmaline reimbursed him for it.  *Id.* ¶ 21.

On Friday, December 14, 2012, at approximately 4:05 p.m., Monaco resigned by e-mail. Am. Compl. ¶ 3; Answer ¶ 3.  When he resigned, Monaco was servicing fifteen clients, thirteen of which were Canadian.  L.R. 56(a) Stmts. ¶ 32.  Since Monaco's resignation, Tourmaline has done no business with, and received no revenue from, those clients.  Hantman Aff. ¶ 39.

On, Monday, December 17, 2012, the next business day after he resigned, Monaco began working for Greenwich Prime, a firm located in Stamford, Connecticut that offers trading services for the asset management industry.  L.R. 56(a) Stmts. ¶¶ 35, 38.  Tourmaline's principals had a prior business relationship with Greenwich Prime.  *Id.* ¶ 38.

## III.   PROCEDURAL BACKGROUND

In September 2013, during the discovery period in this case, Monaco's counsel withdrew and Monaco filed a pro se appearance.  On December 24, 2013, Tourmaline filed a motion to compel following Monaco's failure to respond to Tourmaline's interrogatories and requests for production.  ECF No. 45.  The Court granted the Motion to Compel absent objection on January

15, 2014.  ECF No. 46.  Monaco failed to comply with the Court's order compelling discovery.

Tourmaline moved for sanctions.  ECF No. 47.  The Court held oral argument and entered a

scheduling order for Monaco to provide all outstanding discovery responses.  Monaco provided

responses on or about April 17, 2014.  He objected to ten of the twenty-five interrogatories, well

beyond the appropriate time to file objections, and contended that he could not recall information

requested.  He objected to eleven of the twelve document requests and produced no documents.

On September 23, 2014, the Court ruled on Tourmaline's motion for sanctions.  The

Court declined to enter a default judgment against Monaco and dismiss the case.  Instead, the

Court awarded attorneys' fees and costs to Tourmaline, and ruled that "defendant is limited to

the discovery responses provided, any objections to plaintiff's discovery requests are waived,

and defendant is precluded from offering a defense based on any discovery materials that have

not been provided to date."  ECF No. 95 at 18.  The Court did not reopen discovery, which had

closed on January 3, 2014.  *Id.* at 12, 18.

## IV.    DISCUSSION

### A.    Count One: Violation of CUTSA

CUTSA prohibits misappropriation of trade secrets.  "Misappropriation" means:

> (1) Acquisition of a trade secret of another by a person who knows
> or has reason to know that the trade secret was acquired by
> improper means; or (2) disclosure or use of a trade secret of
> another without express or implied consent by a person who (A)
> used improper means to acquire knowledge of the trade secret; or
> (B) at the time of disclosure or use, knew or had reason to know
> that his knowledge of the trade secret was (i) derived from or
> through a person who had utilized improper means to acquire it;
> (ii) acquired under circumstances giving rise to a duty to maintain
> its secrecy or limit its use . . . ; or (iii) derived from or through a
> person who owed a duty to the person seeking relief to maintain its
> secrecy or limit its use; or (C) before a material change of his
> position, knew or had reason to know that it was a trade secret and
> that knowledge of it had been acquired by accident or mistake.

Conn. Gen. Stat. § 35–51(b).

The Court will deny summary judgment as to this claim because Tourmaline has raised a genuine dispute as to whether (1) information allegedly acquired by Monaco constituted trade secrets, and (2) Monaco disclosed or used Tourmaline's trade secrets and, at the time of the alleged disclosure or use, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

### 1.    Trade Secrets

Tourmaline has raised a genuine dispute as to whether information Monaco allegedly acquired constituted trade secrets.  "Trade secret" means:

> information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35-51(d).

Whether information constitutes a trade secret is a question of fact.  *Elm City Cheese Co. v. Federico*, 251 Conn. 59, 68 (1999) ("The question of whether information sought to be protected by the trade secrets act rises to the level of a trade secret is one of fact for the trial court.") (internal quotation marks and citation omitted); *Charter Oak Lending Grp., LLC v. August*, 127 Conn. App. 428, 455-56 n.8 (2011) ("The question of whether information sought to be protected by CUTSA rises to the level of a trade secret is a question of fact.").

4

Tourmaline principal Aaron Hantman testified that, during his time at Tourmaline, Monaco "was given unfettered access to Plaintiff's business plans and competitive strategies, as well as detailed information concerning its client base, including the identities and contact information for those clients that had insisted that their trading activities remain anonymous." Hantman Aff. ¶ 13.  He testified that Monaco "acquired proprietary and confidential information concerning Plaintiff's business relationships, including client identities and investment preferences and practices, client contact information, client portfolio content revealing such things as risk appetite, commission production, vendor rates and trade history." *Id.* ¶ 14. Finally, Tourmaline sent Monaco an interrogatory seeking all information related to Tourmaline's business to which Monaco had access, including client portfolio content, client investment preferences, trading history, business plans, strategies, and processes.  Pl.'s First Set of Interrogs. and Reqs. for Prod. of Docs. at 10-11.  Monaco refused to respond to that interrogatory and others, leading to sanctions.  As discussed *infra*, an adverse inference may appropriately be drawn from Monaco's failure to respond to Tourmaline's discovery requests.

As to whether the above-discussed information derives economic value from being secret, Mr. Hantman testified that Tourmaline "offers and strives to ensure complete confidentiality for all of its clients and, where requested, absolute anonymity for certain of its clients.  Clients are offered the freedom to trade with anonymity, a circumstance that is integral to [Tourmaline]'s business model and essential to its financial success."  Hantman Aff. ¶ 5.  He testified that "[t]he continued confidentiality of [Tourmaline]'s client confidentiality of [Tourmaline]'s client relationships is extremely valuable and vital to [Tourmaline] and [Monaco], armed with such knowledge, had the ability to utilize this information to benefit others and himself and inflict harm on [Tourmaline]."  *Id.* ¶ 15.

As to reasonable efforts to maintain secrecy, Mr. Hantman testified that the information that Monaco allegedly acquired "is not commonly known and cannot be found by the public in the open marketplace."  *Id.* ¶ 14.  He elaborated that Tourmaline "takes reasonable precautions to protect its confidential, proprietary and trade secret information, its customer database, and its resulting goodwill[,]" including requiring employees to maintain client confidentiality, maintaining secure facilities, limiting access to its premises, and password protecting electronic equipment and systems.  *Id.* ¶¶ 18-19.  Moreover, Tourmaline submitted two agreements prohibiting Monaco from using or disclosing its confidential information.  ECF No. 100-6.

Construing Mr. Hantman's testimony and the other evidence in the light most favorable to Tourmaline, and drawing all reasonable inferences in Tourmaline's favor, a reasonable jury could find that information that Monaco allegedly acquired constituted trade secrets.  *See Saye v. Old Hill Partners, Inc.*, 478 F. Supp. 2d 248, 274-75 (D. Conn. 2007) (genuine dispute existed as to whether investment firm's business formula, which included investment and trading strategy, investor lists, portfolio contents, financing methods, identities of broker-dealers from whom particular fixed-income securities could be purchased, marketing methods, and back-office operations, constituted a trade secret under CUTSA, precluding summary judgment in favor of former employee); *Smith v. Snyder*, 267 Conn. 456, 463-64 (2004) (jury reasonably could have awarded damages under CUTSA for misappropriation of information including customer identities, pricing schemes, and processes).

### 2.      Disclosure or Use of Trade Secrets

Monaco argues that Tourmaline has not put forth any evidence that Monaco used or disclosed any information obtained from Tourmaline.  Tourmaline counters that it has no such

evidence because Monaco failed to answer its discovery requests, and Monaco cannot now rely on the absence of such evidence as a ground for summary judgment in his favor.

Tourmaline served Monaco with the following interrogatory:

> Please describe in as much detail as possible any and all information related to Tourmaline's business, including but not limited to, former, existing and/or potential client contact information, client portfolio content, client investment preferences, trading history, marketing and/or business ideas, business plans, competitive strategies, client needs and/or preferences, business processes, business relationships and/or business contacts, the Defendant has disclosed to Greenwich Prime at any time including, but not limited to, during his employment with Tourmaline, his hiring by Greenwich Prime, or his affiliation with and/or employment by Greenwich Prime.

Pl.'s First Set of Interrogs. and Reqs. for Prod. of Docs. at 11.  Tourmaline also asked Monaco to identify all third parties besides Greenwich Prime to whom he disclosed such information, the date of disclosure, and the reason(s) for disclosure.  *Id.* at 12.

As a result of Monaco's failure to answer these and other discovery requests, he is "precluded from offering a defense based on any discovery materials that have not been provided to date."  ECF No. 95 at 18.  Monaco argues that he is precluded only from basing a defense on existing materials that he did not provide, not from using Tourmaline's lack of evidence as a ground for summary judgment.  In this circumstance, the Court finds it appropriate to draw an adverse inference from Monaco's failure to comply with his discovery obligations.

"[D]istrict courts have broad discretion in fashioning an appropriate sanction for a party's failure to produce documents in breach [of] its discovery obligations . . . ."  *Bogosian v. All Am. Concessions*, No. 06-CV-1633 (RRM) (RML), 2011 WL 4460362, at *7 n.4 (E.D.N.Y. Sept. 26, 2011); *accord Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) ("Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs."); *Reilly v. Natwest*

*Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses").

An adverse inference is an appropriate sanction to address a party's failure to respond to discovery requests.  *See Residential Funding Corp.*, 306 F.3d at 107 ("Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to . . . give an adverse inference instruction."); *Reilly*, 181 F.3d at 267–68 (holding that district court did not abuse its discretion in giving adverse inference instruction to redress party's failure to produce files in discovery); *Bogosian*, 2011 WL 4460362, at *7-8 & n.4 (drawing adverse inference at summary judgment where party repeatedly failed to comply with discovery obligations, and noting that the lack of record evidence necessary to support summary judgment was "entirely due to [defendant's principal's] intractability during discovery"); *PSG Poker, LLC v. DeRosa-Grund*, No. 06 CIV. 1104 (DLC), 2008 WL 190055, at *12 (S.D.N.Y. Jan. 22, 2008) (drawing adverse inference at summary judgment where party "was reminded of his discovery obligations, given a 'final opportunity' to meet them, and warned of the consequences of his failure to do so – yet he did not heed that warning").

An adverse inference may be drawn if (1) the party having control over the evidence had an obligation to timely produce it; (2) the party that failed to timely produce the evidence had a culpable state of mind; and (3) the missing evidence is relevant to a claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.  *Residential Funding Corp.*, 306 F.3d at 107.

First, the Court ordered Monaco to respond to Tourmaline's discovery requests.  Second, the culpable state of mind need not rise to the level of intent or recklessness; negligence is sufficient.  *Id.* at 108.  Monaco's failure to respond to the majority of Tourmaline's discovery requests, and his failure to engage successor counsel to help him respond to those requests after the Court's order, "reflects a conscious decision deliberately to disregard his duties as a litigant, thus meeting the 'culpable state of mind' requirement."  *Bogosian*, 2011 WL 4460362, at *7.  Third, evidence regarding Monaco's disclosure of Tourmaline's confidential information would be relevant to Tourmaline's CUTSA, CUTPA, and breach claims.

Drawing an adverse inference from Monaco's failure to respond to Tourmaline's discovery requests, a reasonable jury could find that Monaco disclosed to Greenwich Prime and/or others information constituting trade secrets.  Indeed, Monaco's objections to the relevant interrogatories as "unduly burdensome," *see* Def.'s Response to Pl.'s Interrogs. and Reqs. for Prod. ¶¶ 7, 9, could be read to suggest that volumes of evidence exist regarding the disclosure of Tourmaline's information to Greenwich Prime and others.

The Court recognizes that an adverse inference alone cannot defeat a motion for summary judgment.  *See Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998).  But in "borderline cases," in combination with "not insubstantial" evidence, an adverse inference can raise a genuine dispute of material fact.  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001); *Valenti v. Penn Mut. Life Ins. Co.*, 850 F. Supp. 2d 445, 454 (S.D.N.Y. 2012) *aff'd*, 511 F. App'x 57 (2d Cir. 2013) ("[A]n adverse inference standing alone may not defeat a motion for summary judgment in the absence of some other, 'not insubstantial' evidence of a triable issue of fact.").  "Some quota of evidence is needed to assign probative force to withheld documents."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012).

The Court concludes that this is a borderline case presenting not insubstantial evidence supplementing the adverse inference. Monaco resigned at approximately 4:05 p.m. on a Friday, and began working for a competitor located in the same town as Tourmaline the following business day, taking with him clients that he serviced for nearly two years while employed by Tourmaline, during which time he allegedly had access to, and acquired, confidential information of Tourmaline's. This circumstantial evidence gives probative force to the adverse inference arising from Monaco's refusal to respond to Tourmaline's discovery requests seeking information as to what confidential information Monaco had access to while at Tourmaline, and what information Monaco disclosed to Greenwich Prime and others following his resignation. *See Kronisch*, 150 F.3d at 126 (combined with adverse inference drawn from destruction of evidence, plaintiff's circumstantial evidence that the CIA placed LSD in his drink in a Paris café in October 1952 "was enough—barely enough, but enough nonetheless—to entitle him to proceed to trial."); *see also Byrnie*, 243 F.3d 93, 110 (2d Cir. 2001) ("[A] party seeking an adverse inference may rely on circumstantial evidence to suggest the contents of destroyed evidence. It then becomes a matter for the jury to decide, based on the strength of the evidence presented, whether the documents likely had such content."); *cf. Saye*, 478 F. Supp. 2d at 256-57, 275 (denying summary judgment as to CUTSA claim where circumstantial evidence suggested that former employee contacted investors of his former investment firm, and formed competing fund using his former firm's proprietary investment strategies).

### B.     Count Two: Violation of CUTPA

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42–110b(a). It further provides that "[a]ny person who suffers any ascertainable loss of money

or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action to recover actual damages," punitive damages, and equitable relief.  *Id.* § 42-110g(a).

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity."  *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995).  "[I]t is construed liberally in an effort to effectuate its public policy goals."  *Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 881 (2015) (quoting *Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747, 756 (1984)).  In determining whether a practice violates CUTPA, courts consider "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  *Gaynor v. Hi-Tech Homes*, 149 Conn. App. 267, 275 (2014).

As an initial matter, Monaco argues that a CUTPA claim cannot lie in this case because the alleged unfair acts occurred within the employee-employer relationship.  Def.'s Mem. at 15-16.  The Court disagrees.  Tourmaline claims that, following his resignation, Monaco engaged in unfair or deceptive acts or practices by allegedly using and/or disclosing Tourmaline's confidential information, thereby breaching contracts and fiduciary duties.  *See Larsen*, 232 Conn. at 493-94 (where defendant allegedly accepted a job with a competitor and then took actions that harmed plaintiff, the allegedly tortious conduct was outside the scope of the employer-employee relationship and could therefore support a CUTPA claim).

Monaco also argues that the CUTPA claim fails under the doctrine of inevitable disclosure.  The doctrine of inevitable disclosure generally is used by plaintiffs "as a substitute for evidence of actual disclosure where the nature of the new employment creates a risk that disclosure of this information is inevitable." *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478 (GEL), 2009 WL 399221, at *11 (S.D.N.Y. Feb. 18, 2009) (internal quotation marks and citation omitted).  "Absent evidence of actual misappropriation by an employee, the doctrine should be applied in only the rarest of cases[,]" and it typically is applied "in the early stages of a case, prior to discovery, in the context of whether there is a sufficient risk of irreparable injury to support the issuance of a preliminary injunction." *Id.*  Here, Tourmaline does not assert inevitable disclosure, and the Court, not relying on that doctrine at this late stage, has held that the adverse inference drawn from Monaco's discovery failures, coupled with other not insubstantial evidence, raises a genuine dispute of material fact.

A genuine dispute exists as to whether Monaco misappropriated trade secrets and/or other confidential information, and thereby breached contracts and a fiduciary duty, and the Court concludes that Monaco has raised a genuine dispute of material fact as to whether Monaco's alleged conduct constitutes unfair or deceptive acts or practices in violation of CUTPA.  *See, e.g.*, *Saye*, 478 F. Supp. 2d at 276-77 (denying summary judgment as to CUTPA claim where circumstantial evidence suggested that former employee contacted investors of his former investment firm and formed competing fund using his former firm's proprietary investment strategies); *Imaginative Research Assocs., Inc. v. Ramirez*, 718 F. Supp. 2d 236, 255 (D. Conn. 2010) (denying summary judgment as to CUTPA claim where genuine issues of material fact remained as to whether defendant disclosed and used his former company's trade secrets and/or other confidential information to form new company); *see also Garden Catering-Hamilton Ave.,*

12

*LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117, 140 (D. Conn. 2014) (concluding that genuine issues existed as to whether defendants breached fiduciary duty by using their former employer's food preparation and pricing trade secrets to start competing business and noting that "the same conduct that could form the basis for a breach of fiduciary duty claim could also support a CUTPA violation.").

### C.      Count Three: Breach of Fiduciary Duty and Duty of Loyalty

Tourmaline contends, without citation to any authority, that "[a]s an employee of [Tourmaline], [Monaco] was a fiduciary and was obligated to exercise good faith, loyalty and honesty towards [Tourmaline]."  Pl.'s Mem. at 16, ECF No. 100; *cf. Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 223 (1994) ("Simply classifying a party as a fiduciary inadequately characterizes the nature of the relationship.").  In order to assert breach of fiduciary duty, Tourmaline must establish the existence of a fiduciary relationship.  *Biller Assocs. v. Peterken*, 269 Conn. 716, 723 (2004) ("It is axiomatic that a party cannot breach a fiduciary duty to another party unless a fiduciary relationship exists between them.").  The Connecticut Supreme Court has refrained from "defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations."  *Zeller*, 228 Conn. at 223 (quoting *Harper v. Adametz*, 142 Conn. 218, 225 (1955)).  "It has left the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other."  *Harper*, 142 Conn. at 225.

In *Charter Oak Lending Grp., LLC v. August*, 127 Conn. App. 428, 430-33 (2011), a mortgage broker asserted breach of fiduciary duty against former employees who accepted employment with a competitor and allegedly provided that competitor with the plaintiff's confidential information.  The trial court found that the relationship between the parties was a

principal-agent relationship and not fiduciary in nature. *Id.* at 440. The Appellate Court of

Connecticut reversed, reasoning:

> An agent is a fiduciary with respect to matters within the scope of
> his agency. Agency is the fiduciary relation which results from the
> manifestation of consent by one person to another that the other
> shall act on his behalf and subject to his control, and consent by the
> other so to act. The relationship of principal and agent implies
> trust or confidence by the principal in the agent, and the agent is
> obligated to exercise the utmost good faith, loyalty and honesty
> toward his principal or employer . . . . The general duty of loyalty
> includes . . . the duty not to compete . . . and the duty not to
> disclose confidential information.

*Id.* at 441 (internal quotation marks and citations omitted). The court held that the plaintiff had

introduced sufficient evidence of an agency relationship to support a finding of a fiduciary duty.

*Id.* at 442.

Here, a reasonable jury could find that Monaco was an agent of Tourmaline's, that

Monaco consented to and did act on Tourmaline's behalf and subject to its control as its Director

of Canadian Trading and Business Development, that Tourmaline entrusted Monaco with

confidential information concerning its clientele and operations, and that a fiduciary relationship

therefore existed. *See id.* at 441-42.

A reasonable jury also could find that Monaco breached his alleged fiduciary duty. "The

law is well settled that knowledge acquired by an employee during his employment cannot be

used for his own advantage to the injury of the employer during the employment; and after the

employment has ceased the employee remains subject to a duty not to use trade secrets, or other

confidential information which he has acquired in the course of his employment, for his own

benefit or that of a competitor to the detriment of his former employer." *Allen Mfg. Co. v. Loika*,

145 Conn. 509, 514 (1958); *accord Elm City Cheese Co.*, 251 Conn. at 69 ("Even after the

employment has ceased . . . the employee remains subject to a duty not to use trade secrets, or

other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer.") (internal quotation marks and citation omitted).

Because Tourmaline has raised a genuine dispute as to whether Monaco used or disclosed its trade secrets and/or confidential information to its detriment, the Court must deny summary judgment as to this claim. *See, e.g.*, *Panterra Engineered Plastics, Inc. v. Transp. Sys. Sols., LLC*, No. 3:05-cv-01447 (VLB), 2008 WL 877003, at *3 (D. Conn. Mar. 27, 2008) (denying summary judgment as to breach of fiduciary duty claim where genuine issue existed as to whether defendants misappropriated plaintiff's trade secrets); *Sperry Rand Corp. v. Rothlein*, 241 F. Supp. 549, 559 (D. Conn. 1964) (defendants breached duties of loyalty and fidelity to their former employer by, *inter alia*, misappropriating and using for their own purposes the plaintiff's trade secrets); *cf. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d at 140 (denying summary judgment as to breach of fiduciary duty claim where genuine issues existed as to whether defendants used former employer's food preparation and pricing trade secrets to start competing business); *Ramirez*, 718 F. Supp. 2d at 255 (denying summary judgment as to breach of fiduciary duty claim where genuine issues remained as to whether defendant disclosed and used his former company's trade secrets and/or other confidential information to form new company).

### D.    Count Four: Breach of Contract

#### 1.    The First Agreement

The First Agreement does not have a choice of law provision.  Monaco argues that California law should apply because Monaco worked out of his home office in California starting in July 2012, approximately one year and six months after he entered into the First Agreement. Tourmaline argues that Connecticut law should apply because the First Agreement was executed

in Connecticut, Monaco worked for Tourmaline in Connecticut after the agreement was executed, and Monaco went to work for a competitor based in Connecticut.  The Court agrees with Tourmaline.

A federal court sitting in diversity must apply the choice of law provisions of the forum state to determine which state's law to apply.  *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999).  "Absent an effective choice of law provision in the contract, Connecticut applies the law of the state with the 'most significant relationship' to the transaction and the parties." *Zurich Am. Ins. Co. v. Expedient Title, Inc.*, No. 3:11-cv-001633 (MPS), 2015 WL 9165875, at *8 n.2 (D. Conn. Dec. 16, 2015).  In determining which state has the most significant relationship to the transaction and the parties, courts consider *inter alia*: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 783 (2000).

The parties negotiated and executed the First Agreement in Connecticut.  Monaco worked in Connecticut under its terms.  The First Agreement protected Tourmaline's confidential information and intellectual property located in Connecticut.  Tourmaline is incorporated, and has its principal place of business, in Connecticut.  Before Monaco moved to California, he and Tourmaline entered into the Second Agreement, which expressly provides for the application of Connecticut law, evidencing that the parties intended for their relationship to be governed by Connecticut law.  The Court concludes that Connecticut has the most significant relationship to the transaction and the parties, and therefore applies Connecticut law.

Tourmaline alleges that Monaco breached the First Agreement, which provides:

Employee will not, directly or indirectly, at any time during his or her employment or thereafter, use for himself or others, or disclose to others, any Confidential Information (as defined below), regardless of whether conceived, developed, or perfected by him and no matter how it became known to him, unless (1) he first secures the Company's written consent to such disclosure or use, (2) the same shall have lawfully become a matter of public knowledge other than by his act or omission, or (3) he is ordered to disclose the same by a court of competent jurisdiction or is otherwise required to disclose the same by law, and he promptly notifies the Company of such disclosure in writing so as to allow the Company to take appropriate measures to protect such information from disclosure or production.

"Confidential Information" means all business and other proprietary information (regardless of whether in written or other tangible form) that relates to the Company and that is not known to the public generally (absent Employee's disclosure), including but not limited to confidential knowledge, operating instructions, training materials and systems, test results, research program data, methods, customer lists and information, sales records and documents, marketing and sales and trading strategies and plans, market surveys, cost and profitability analyses, independent research, pricing information, contract information or terms, competitive strategies, personnel-related information and supplier lists.

First Agmt. ¶ I.A-B, ECF No. 100-6.

Monaco relies on paragraph VI.A.1 of the First Agreement, which provides:

During employment the Employee will not assist any competitor of the Company in any capacity.  During the twelve (12) month period immediately following the termination of employment for any reason (the "Restricted Period"), without the Company's prior written consent, Employee will not directly or indirectly (as an owner, shareholder, principal, member, director, officer, employee, manager, consultant, independent contractor, advisor or otherwise): . . . on his own behalf or on the behalf of another person or entity, . . . (d) solicit, divert or appropriate or attempt to solicit, divert or appropriate the business of any customer, client (*for the purpose of this Paragraph VI.A.1, the terms "customer" and "client" shall exclude any customer or client doing business with the Company solely as a result of a referral by the Employee*) or contractual partner of the Company; (e) encourage, persuade or entice any customer, client or contractual party of the Company to

> sever, terminate, reduce or decrease the scope of its business
> relationship with the Company; (f) interfere with or disrupt the
> relationship between the Company and any of its employees,
> consultants, clients, customers or contractual partners; or (g)
> provide services for, whether as a consultant, employee or owner,
> any client or customer of the Company.

*Id.* ¶ VI.A.1 (emphasis added).

Monaco argues that the clients he serviced after leaving Tourmaline were not "customers" or "clients" of Tourmaline's for purposes of the above language because they did business with Tourmaline solely as a result his referrals. Monaco submitted sworn affidavits from officers of thirteen of those clients attesting that their respective firms "[were] referred to Tourmaline Partners solely by Nicola Monaco and no other parties." *E.g.*, Chartrand Aff. ¶ 4, ECF No. 89-12.

The elements of a breach of contract claim are (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014).

First, the parties entered into the First Agreement. L.R. 56(a) Stmts. ¶ 16.

Second, Tourmaline alleged in its Amended Complaint that it performed its obligations under the First and Second Agreements, Am. Compl. at 15, and Monaco failed to deny that allegation with particularity as required under Federal Rule of Civil Procedure 9(c), Answer at 8. As a result, the allegation is deemed admitted, and Tourmaline has established that it performed under the First and Second Agreements. *See Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, No. 3:14-cv-00458 (VAB), 2015 WL 4978684, at *6-7 (D. Conn. Aug. 20, 2015).

Third, as discussed *supra*, Tourmaline has raised a genuine dispute as to whether Monaco used and/or disclosed Tourmaline's trade secrets and/or confidential information after his resignation. Thus, a reasonable jury could find that Monaco breached paragraph I.A. of the First

Agreement, which prohibits unauthorized use and disclosure of Tourmaline's confidential information during or after employment.  Monaco's reliance on paragraph VI.A.1 is misplaced with respect to Tourmaline's allegation that Monaco breached paragraph I.A.  Paragraph I.A addresses use and disclosure of Tourmaline's confidential information, while paragraph VI.A.1 addresses solicitation of Tourmaline's clients and customers.  Paragraph I.A's prohibition on use and disclosure of confidential information is not limited by the sole-referral exception in Paragraph IV.A.1.

To the extent that Tourmaline also alleges that Monaco breached Paragraph IV.A.1, the Court concludes, in light of the adverse inference and other not insubstantial circumstantial evidence, that a genuine dispute exists as to whether Tourmaline solicited or misappropriated Tourmaline clients or customers other than those that he referred to Tourmaline.  The parties have stipulated that Monaco brought clients with him when he joined Tourmaline, L.R. 56(a) Stmts. ¶ 11, and that Monaco was servicing fifteen clients, including thirteen Canadian clients, when he resigned, *id.* ¶ 32.  Monaco submitted sworn affidavits from thirteen of those fifteen clients attesting that they "[were] referred to Tourmaline Partners solely by Nicola Monaco and no other parties."  *E.g.*, Chartrand Aff. ¶ 4, ECF No. 89-12.  From this evidence, the Court cannot conclude as a matter of law that Monaco did not, after his resignation, solicit Tourmaline clients that he did not refer to Tourmaline.  Moreover, Tourmaline asked Monaco to produce in discovery communications between Monaco and Tourmaline clients concerning Monaco's employment with Greenwich Prime, and Monaco produced no documents in response, claiming, *inter alia*, that the requests were "unduly burdensome."  *See* Pl.'s First Set of Interrogs. and Reqs. for Prod. of Docs. at 13; Def.'s Responses at 2, 4.  The Court finds that an adverse inference is appropriate, and that summary judgment is not.

With respect to damages, Mr. Hantman testified that Tourmaline lost revenue from Monaco's client accounts after his resignation.  *See* Hantmann Aff. ¶ 48; *cf. Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (company's "president was fully capable of examining the company's sales over a period of years, noting a slow-down, and testifying to the estimated losses attributable to" defendants' conduct).  Genuine disputes exist as to whether Monaco solicited those client accounts in breach of the First and/or Second Agreements, and whether he used or disclosed Tourmaline's confidential information when servicing those client accounts at the time and after they stopped generating revenue for Tourmaline.  The Court concludes that Tourmaline has raised a genuine dispute as to its claim that Monaco breached the First Agreement.

### 2.    The Second Agreement

The Second Agreement contains a choice-of-law provision choosing Connecticut law. Second Agmt. ¶ 13, ECF No. 100-6.  Connecticut follows the Restatement (Second) of Conflict of Laws, which enforces choice of law provisions unless (i) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (ii) application of that state's law would contradict a fundamental policy of a state that has a materially greater interest in the action and whose law would otherwise apply had it not been for the parties' choice.  *Elgar v. Elgar*, 679 A.2d 937, 941-42 (Conn. 1996); Restatement (Second) of Conflict of Laws § 187 (1971).  While Monaco now lives in California and California law disfavors non-competition covenants, the Court concludes, for the reasons discussed *supra*, that California does not have a materially greater interest in this action, and California law would not otherwise apply had it not been for the parties' choice that Connecticut law shall apply.

Again, the elements of a breach of contract claim are (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers*, 311 Conn. at 291.

As to the first element, Monaco argues that he did not receive consideration for the Second Agreement and therefore it is unenforceable.  He argues that his continued employment was not consideration because it is an illusory promise in the case of an at-will employee – the employer can terminate the employment relationship at any time.  Tourmaline argues that it gave Monaco a discretionary quarterly bonus as consideration for the Second Agreement, and argues that Monaco's continued employment was adequate consideration under Connecticut law.

First, the Second Agreement recites Monaco's consideration, including his receipt of Tourmaline's confidential information, his continued employment, and his eligibility to receive future discretionary bonuses.  Second Agmt. at 2, ECF No. 100-6.  Second, Mr. Hantman testified that Tourmaline paid Monaco a discretionary bonus in consideration for the Second Agreement.  Hantman Aff. ¶ 25; L.R. 56(a) Stmts. ¶ 19.  Because the above is sufficient to raise a genuine dispute as to whether Monaco received consideration for the Second Agreement, the Court need not reach the question of whether continued employment constitutes adequate consideration, but notes its previous recognition that "the Connecticut Supreme Court has long recognized that continued employment may suffice as adequate consideration to support a covenant in an at-will employment relationship." *MacDermid, Inc. v. Raymond Selle & Cookson Grp. PLC*, 535 F. Supp. 2d 308, 316 (D. Conn. 2008) (citing *Dolak v. Sullivan*, 144 A.2d 312, 316 (Conn. 1958) and *Roessler v. Burwell*, 176 A. 126, 127 (Conn. 1934)).

As to the second element, as discussed *supra*, Tourmaline has established that it performed.

21

As to the third element, the Second Agreement prohibits use and disclosure of Tourmaline's confidential information, prohibits Monaco from soliciting Tourmaline clients or customers for six months after his termination, and requires Monaco to return Tourmaline's property upon his termination.  *See* Second Agmt. ¶¶ 5-7, 9.  Unlike the First Agreement, the Second Agreement's prohibition on solicitation of clients or customers does not contain a sole-referral exception.

As discussed *supra*, genuine disputes exist as to whether Monaco used and/or disclosed Tourmaline's trade secrets and/or confidential information and solicited Tourmaline clients.  As discussed *infra*, a genuine dispute exists as to whether Monaco reimbursed Tourmaline for, and therefore is permitted to keep, equipment that Tourmaline purchased for Monaco's home office.  These genuine disputes preclude summary judgment as to Tourmaline's claim that Monaco breached the Second Agreement.

Tourmaline also alleges that Plaintiff breached a notice provision, which provides in relevant part:

> I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO NINETY (90) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE.  If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the COMPANY may request.  The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

Second Agmt. ¶ 15.

Monaco argues that Tourmaline failed to exercise its 90-day option, and Tourmaline argues that Monaco did not give it a chance.  A reasonable jury could find that, resigning by e-mail at 4:05 p.m. on a Friday and then beginning employment with a competitor on the following business day, Monaco did not provide Tourmaline with an adequate opportunity to exercise its 90-day option.  Therefore, the Court will deny Monaco's motion for summary judgment as to Tourmaline's claim that Monaco breached the notice provision.

Fourth, as discussed *supra*, Tourmaline has raised a genuine dispute as to whether it suffered damages as a result of Monaco's conduct.

### E.      Count Five: Replevin

"The action of replevin may be maintained to recover any goods or chattels in which the plaintiff has a general or special property interest with a right to immediate possession and which are wrongfully detained from him in any manner, together with the damages for such wrongful detention."  Conn. Gen. Stat. § 52-515.

Tourmaline reimbursed Monaco for a cell phone he bought, and Tourmaline purchased office equipment for Monaco's home office.  Tourmaline claims that Monaco never reimbursed it for these items, they are therefore Tourmaline's property, and Plaintiff must return them.  Monaco argues that the cost of these items was deducted from his pay and, therefore, he does not need to return the items.

Monaco testified that Tourmaline deducted the cost of the items from his pay.  Monaco Aff. ¶ 6, ECF No. 89-7.  He submitted a spreadsheet that he contends demonstrates those deductions.  ECF No. 89-7 at 6.  The spreadsheet does not specify which figures are attributable to the equipment, and the Court cannot conclude as a matter of law from the face of the spreadsheet that the entire cost of all of the equipment was deducted from Monaco's pay.  *See id.*

Moreover, Mr. Hantman testified that Tourmaline was never reimbursed for the equipment through deductions from Monaco's pay.  Hantman Aff. ¶¶ 44-46.  The Court may not weigh this competing evidence, and must deny summary judgment as to this claim.

### F.    Count Six: Conversion

"Conversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 418 (2007).  To establish a prima facie case of conversion, the plaintiff must demonstrate that "(1) the material at issue belonged to the plaintiff, (2) that [the defendant] deprived the plaintiff of that material for an indefinite period of time, (3) that [the defendant's] conduct was unauthorized and (4) that [the defendant's] conduct harmed the plaintiff." *Coster v. DuQuette*, 119 Conn. App. 827, 832 (2010).

As discussed *supra*, Tourmaline has raised a genuine dispute as to whether Monaco reimbursed it for the equipment and whether the equipment belongs to Tourmaline.  Monaco has deprived Tourmaline of the equipment since the time of his resignation.  The Second Agreement requires Monaco to return Tourmaline's property upon his termination.  Finally, Tourmaline has raised a genuine dispute as to harm at least in the amount of the value of the equipment.  Accordingly, the Court must deny summary judgment as to this claim.

## V.    CONCLUSION

For the foregoing reasons, Monaco's Motion for Summary Judgment (ECF No. 89) is DENIED.  SO ORDERED at Bridgeport, Connecticut this sixteenth day of February, 2016.


  /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE